Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order

APR 26 2012

David J. Bradley, Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | Criminal No. |
| v. | § § | UNDER SEAL |
| OLUSOLA ELLIOT, | § § | H 12 -249 |
| Defendant. | § § | |

UNSEALED
PER ARREST
5/3/2012

## INDICTMENT

The Grand Jury charges:

### General Allegations

At all times material to this Indictment, unless otherwise specified:

1. The Medicare Program ("Medicare") was a federal healthcare program providing benefits to individuals who were over the age of 65 or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Medicare was a "healthcare benefit program" as defined by Title 18, United States Code, Section 24(b).

2. Medicare was subdivided into multiple Parts. Medicare Part B covered ambulance transportation services.

3. Individuals who qualified for Medicare benefits were commonly referred to as "Medicare beneficiaries." Each Medicare beneficiary was given a Medicare identification number.

4. The Medicare payment benefit for ambulance services was very restricted. Medicare covered ambulance services only if furnished to a beneficiary whose medical condition at the time of transport was such that transportation by other means would endanger the patient's

health. A patient whose condition permitted transport in any type of vehicle other than an ambulance did not qualify for Medicare payment. Medicare payment for ambulance transportation depended on the patient's condition at the actual time of the transport regardless of the patient's diagnosis. To be deemed medically necessary for payment, the patient must have required both the transportation and the level of service provided.

5. Ambulance transportation was only covered when the patient's condition required the vehicle itself and/or the specialized services of the trained ambulance personnel. A requirement of coverage was that the needed services of the ambulance personnel were provided and clear clinical documentation validated the medical need and the provision in the record of the service (usually the run sheet).

6. Ambulance services were only covered in the absence of an emergency condition under either of the following circumstances: (1) the patient being transported could not be transported by any other means from the origin to the destination without endangering the individual's health or (2) the patient was before, during and after transportation, bed confined. For purposes of Medicare coverage, "bed confined" meant the patient met all of the following three criteria: (1) unable to get up from bed without assistance, (2) unable to ambulate and (3) unable to sit in a chair (including a wheelchair).

7. A thorough assessment and documented description of the patient's current state was essential for coverage. All statements about the patient's medical condition or bed-bound status must have been validated in the documentation using contemporaneous objective observations and findings.

8. For ambulance services to have been covered by Medicare, the transport must have been to the nearest institution with appropriate facilities for the treatment of the illness or

injury involved. The term "appropriate facilities" meant that the institution was generally equipped to provide hospital care necessary to manage the illness or injury involved. Covered destinations for non-emergency transports included: (1) hospitals; (2) skilled nursing facilities; (3) dialysis facilities; (4) from a skilled nursing facility to the nearest supplier of medically necessary services not available at the skilled nursing facility where the beneficiary was a resident, including the return trip, when the patient's condition at the time of transport required ambulance services; and (5) the patient's residence only if the transport was to return from a hospital and the patient's condition at the time of transport required ambulance services.

9. A community mental health center ("CMHC") was an entity that provided outpatient services for individuals who were chronically mentally ill and residents of its service area who had been discharged from inpatient treatment at a mental health facility. A CMHC may also have provided 24-hour emergency care services and partial hospitalization or psychosocial rehabilitation services.

10. Medicare did not cover ambulance transport from a beneficiary's home to a CMHC because a CMHC was not a hospital, skilled nursing facility or dialysis center.

11. For scheduled non-emergency ambulance transports, providers of ambulance transportation were required to obtain a written physician's certification statement ("PCS") from the patient's attending physician certifying that the medical necessity requirements for ambulance transportation were met. The signature of the medical professional completing the PCS was required to be legible (or accompanied by a typed or written name) and include credentials. Furthermore, the PCS was required to be signed and dated at the time it was completed. For repetitive, non-emergency transports, the following rules applied: (1) a PCS for repetitive transports must have been signed by the patient's attending physician and (2) the PCS

must have been dated no earlier than 60 days in advance of the transport for those patients who required repetitive ambulance services and whose transportation was scheduled in advance.

12. Medicare required the run report to include a description of the patient's symptoms and physical findings in sufficient detail as to demonstrate conditions severe enough to justify payment for ambulance transportation services.

13. Medicare did not cover transportation in vans, privately-owned vehicles, taxicabs, Ambi-buses, ambulettes or Medi-cabs.

14. CMS contracted with Medicare Administrative Contractors ("MACs") to process claims for payment. The MAC that processed and paid Medicare Part B claims in Texas was TrailBlazer Health Enterprises, LLC ("TrailBlazer").

15. To bill Medicare for services rendered, a provider submitted a claim form (Form 1500) to TrailBlazer. When a Form 1500 was submitted, usually in electronic form, the provider certified:

   a. the contents of the form were true, correct and complete;

   b. the form was prepared in compliance with the laws and regulations governing Medicare; and

   c. the services being billed were medically necessary.

16. A Medicare claim for payment was required to set forth, among other things, the following: the beneficiary's name and unique Medicare identification number; the item or service provided; and the cost of the item or service.

17. Double Daniels LLC ("Double Daniels") was a Texas business entity purportedly doing business at 9888 Bissonnet Street, Suite 150-1, Houston, Texas 77036. Among other things, Double Daniels billed Medicare for ambulance transport services from beneficiaries'

4

homes to hospitals when the beneficiaries were actually transported to CMHCs rather than hospitals, and Double Daniels also billed Medicare for ambulance transport services that were not medically necessary.

18. Defendant **OLUSOLA ELLIOT**, a resident of Fort Bend County, Texas, was the owner and operator of Double Daniels.

19. It was a purpose of the scheme or artifice for the defendant and others to unlawfully enrich themselves by (a) submitting false and fraudulent claims to Medicare, (b) concealing the submission of false and fraudulent claims to Medicare and the receipt and transfer of proceeds from the fraud, and (c) diverting proceeds of the fraud for the personal use and benefit of the defendant and his co-conspirators.

## Manner and Means of the Scheme

The manner and means by which the defendant sought to accomplish the purpose and object of the scheme or artifice included, among other things:

20. Defendant **OLUSOLA ELLIOT** would maintain a valid Medicare provider number for Double Daniels to submit claims to Medicare for ambulance services that were miscoded, not medically necessary and not provided.

21. Defendant **OLUSOLA ELLIOT** would supervise the transporting of Medicare beneficiaries in Double Daniels ambulances.

22. Defendant **OLUSOLA ELLIOT** would control the day-to-day operations of Double Daniels.

23. Defendant **OLUSOLA ELLIOT** would submit claims, and cause others to submit claims to Medicare for ambulance services that were miscoded, not medically necessary and not provided.

5

24. Defendant **OLUSOLA ELLIOT** would submit approximately $1,701,940 in claims to Medicare for ambulance services that were miscoded, not medically necessary and not provided.

25. After payments from Medicare were deposited into Double Daniels bank accounts, defendant **OLUSOLA ELLIOT** would transfer proceeds of the fraud to himself and his co-conspirators.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 1-3
### Health Care Fraud
### (18 U.S.C. §§ 1347 and 2)

26. Paragraphs 1 through 25 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

27. On or about the dates specified as to each count below, in the Houston Division of the Southern District of Texas, and elsewhere, defendant,

**OLUSOLA ELLIOT,**

aiding and abetting others known and unknown to the Grand Jury, in connection with the delivery of a payment for healthcare benefits, items and services, did knowingly and willfully execute and attempt to execute, a scheme and artifice to defraud a healthcare benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain by means of materially false and fraudulent pretenses, representations and promises, money and property owned by and under the custody and control of Medicare.

| Count | Medicare Beneficiary | Approx. Date of Services | Description of Services Billed | Approx. Amount of Claim |
|---|---|---|---|---|
| 1 | R.H. | 8/18/2011 | Ambulance Transport | $1,268 |

6

| 2 | R.H. | 8/24/2011 | Ambulance Transport | $1,268 |
| 3 | R.H. | 8/26/2011 | Ambulance Transport | $1,268 |

In violation of Title 18, United States Code, Sections 1347 and 2.

## NOTICE OF CRIMINAL FORFEITURE
### (18 U.S.C. §§ 982(a)(7))

28.     Pursuant to Title 18, United States Code, Section 982(a)(7), the United States of America gives notice to the defendant, **OLUSOLA ELLIOT**, that, in the event of conviction for any of the violations charged in Counts One through Four of the Indictment, the United States intends to forfeit all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of any such offense, including but not limited to, a money judgment in the amount of at least $557,361.78 in United States currency, for which the defendant may be jointly and severally liable.



29.     In the event that the property subject to forfeiture as a result of any act or omission of the defendant:

   a.   cannot be located upon the exercise of due diligence;

   b.   has been transferred or sold to, or deposited with, a third party;

   c.   has been placed beyond the jurisdiction of the court;

   d.   has been substantially diminished in value; or

   e.   has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States to seek forfeiture of any other property of the defendant up to the total value of the property subject to forfeiture, pursuant to Title 21, United States Code, Section 853(p), incorporated by reference in Title 18, United States Code, Section 982(b)(1).

A TRUE BILL

Original Signature on File
FOREPERSON

KENNETH MAGIDSON
UNITED STATES ATTORNEY

WILLIAM C. PERICAK
ASSISTANT CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE
LAURA M.K. CORDOVA
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE